In re W. W. MILLS CO.

(District Court, E. D. North Carolina. April 27, 1908.)

1. CORPORATIONS—REPRESENTATION OF CORPORATION BY OFFICERS—POWER TO TRANSFER PROPERTY.

The secretary of a corporation as such has no authority to assign securities owned by the corporation as collateral security for a past indebtedness.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 1668.]

2. BANKRUPTCY—VOIDABLE "PREFERENCE."

A transfer of property by a corporation as security for a past indebtedness, within four months prior to its bankruptcy, when it was insolvent and the creditor had reason to believe it to be insolvent, is voidable as a preference under Bankr. Act 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), even though such transfer was made in ratification of an unauthorized transfer made by an officer of the corporation before the four months period.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 6, pp. 5498, 5499; vol. 8, p. 7759.]

3. SAME—KNOWLEDGE OF CREDITOR.

A creditor to whom a transfer was made had reasonable cause to believe that a preference was intended, within the meaning of Bankr. Act 1898, c 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), if he had knowledge of facts which would put a prudent man on inquiry, and such inquiry would have shown that the transfer was preferential in its effect.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 256.]

4. SAME—CONVEYANCES AS SECURITY—INSOLVENCY OF DEBTOR.

A transfer by way of mortgage or pledge given to secure an antecedent debt within four months prior to the debtor's bankruptcy and when he is insolvent is void, although the creditor did not know nor have reasonable cause to believe he was then insolvent.

5. CORPORATIONS—ACCOMMODATION PAPER—CONSIDERATION.

A corporation which subsequently became bankrupt was the owner of practically all of the stock of a railroad company, and at the instance of a creditor of the corporation the directors of the railroad company caused a note and a mortgage on its property to be executed to the president of the corporation by whom it was indorsed to the creditor as security for the past indebtedness of the corporation. Held, that such note was without consideration and unenforceable, either by the payee or the creditor, which was not a bona fide purchaser.

6. FRAUDULENT CONVEYANCES—CONSIDERATION.

A pledge by the president of a bankrupt corporation, while personally insolvent, of stocks owned by him to a creditor of the corporation as security for its past indebtedness, held invalid as against his creditors for want of consideration, except as to indebtedness of the corporation on which he was individually liable.

7. BANKS AND BANKING—LIEN ON STOCK—INDEBTEDNESS OF STOCKHOLDER.

A banking corporation chartered by the state of North Carolina by special act purchased a note given by one of its stockholders to a third party, and secured by a pledge of his stock as collateral. Subsequently the corporation purchased the stock from the pledgor at an agreed valuation. Held, that Pub. Laws N. C. 1903, p. 469, c. 275, giving corporations organized thereunder a lien upon their stock for the indebtedness of a stockholder, did not apply to such corporation, and that it had no lien on the proceeds of the pledged stock in excess of that required to pay the

secured note for other indebtedness on which the stockholder was bound as indorser.

[Ed. Note.—Liens of banks on stock, see note to Northern Pac. Ry. Co. v Tynan, 56 C. C. A. 179.]

**8. BANKRUPTCY—VOIDABLE PREFERENCES.**

A corporation deposited sight drafts on third parties in a bank for collection under an agreement that they were to be credited to its account, and, if not paid, were to be taken up by it as cash items. *Held*, that the taking up of such unpaid drafts, although when the corporation was insolvent and within four months prior to its bankruptcy, did not constitute voidable preferences.

**9. SAME—"PREFERENCE."**

The payment to a bank by an insolvent corporation within four months prior to its bankruptcy, and at a time when the bank had reasonable cause to believe it to be insolvent, of notes in favor of the corporation which it had discounted at the bank and indorsed, or of notes given by it to third parties and discounted by the bank constituted voidable preferences given to the bank which it was required to return under Bankr. Act July 1, 1898, c. 541, § 57g, 30 Stat. 560 (U. S. Comp. St. 1901, p. 3443), as amended in 1903, by Act Feb. 5, 1903, c. 487 § 12, 32 Stat. 799 (U. S. Comp. St. Supp. 1907, p. 1030), before it could prove a claim against the bankrupt estate.

In Bankruptcy. On review of decision of referee.

Robt. Strong and Jas. E. Shepherd, for bankrupt.
Jno. W. Hinsdale, for trustee.

PURNELL, District Judge. After many tedious and patient hearings, as evidenced by the voluminous record filed, the referee filed the following report, to which exceptions were filed, and the cause set down for hearing and heard accordingly:

A creditors' petition was filed against the W. W. Mills Company, a North Carolina corporation, upon which it was on November 25, 1904, adjudicated a bankrupt, and the case was duly referred to the referee. Thereupon, on December 19, 1904, the said bankrupt filed its schedules in bankruptcy, showing an aggregate indebtedness of $68,528.71, of which $46,314.40 was owing to the Carolina Trust Company, a North Carolina corporation, hereinafter called the "Trust Company," and alleged to be secured by collaterals. According to said schedules, no other creditor of the bankrupt held any security for his claim. Thereafter the Trust Company filed its proof and its amended proof of secured claim against the said bankrupt, alleging an indebtedness in the aggregate sum of $45,592.93, all of which it alleged to be secured by collaterals furnished by W. W. Mills individually. The said Trust Company thus voluntarily appeared in this court, and submitted itself to the jurisdiction with respect to all matters and questions connected with its said claim and the securities, which it set forth in said proof; its appearance being general in its character. On May 11, 1905, W. L. Watson, Esq., the trustee of the bankrupt, filed objections to the said proof of claim and the securities therein mentioned. Thereupon, on May 19, 1905, the Trust Company filed an answer, asking that its claim with the securities therein set forth be allowed. The bankrupt and other witnesses were examined at length before the referee, both before and after the filing of said objection. All of them were cross-examined by the Trust Company. Under the authority of Loveland on Bankruptcy, p. 630, and Brandenburg on Bankruptcy, p. 532, all of the testimony so taken is considered by the referee in passing upon the objections and in determining the rights of the respective parties, and accompanies this report. Being of the opinion that it is the duty of the referee to examine and decide all the questions raised by the said objections to the proof of claims and to the securities set forth by the Trust Company, the referee has carefully considered

all of said matters and questions, seriatim, and makes his findings of fact, his conclusion of law, and his orders in respect thereto.

The first objection is to the note for $6,800 executed by the Mills Company to the Trust Company on January 20, 1904, and indorsed by W. W. Mills and R. D. Godwin, in that there was no consideration therefor. The referee finds from the evidence as a fact that there was a valuable and adequate consideration for said note, in that it was given in renewal for a note of the same amount, and by the same parties which had been previously discounted by the Trust Company. This objection is therefore overruled.

The second objection is "that, when the said bankrupt paid to the Carolina Trust Company the $3,000 which it received from J. R. Franklin, the bankrupt directed it to be appropriated and applied to the payment of its overdraft in the Carolina Trust Company, which amounted to $1,490, said overdraft being represented by the bankrupt's unpaid check on the Carolina Trust Company for $1,490, which was drawn to take up the following unpaid drafts drawn by the bankrupt upon the following parties and for the following amounts and discounted by the Carolina Trust Company. [Here follows a list of the drafts, etc.]" This objection will be considered in connection with a part of the tenth exception, to wit, that the assignment by the Mills Company to the Trust Company, within four months of the filing of the petition in bankruptcy, of the notes and mortgage of J. R. Franklin for $13,000, the proceeds of which is referred above, as collateral security on the antecedent debt of the Mills Company, was a fraudulent preference; the Trust Company knowing or having reasonable ground to believe that the Mills Company was then insolvent.

The referee finds the following facts: On or before May 20, 1904, the Mills Company was the owner of notes amounting to $13,000 of one J. R. Franklin, secured by mortgage, and was indebted to the Trust Company in a sum exceeding $45,000. R. D. Godwin was the secretary of the Mills Company, having the usual powers of secretary and also having charge of the conduct of its current business; but with no power to pledge, hypothecate, or assign its property to secure antecedent debts. On May 20, 1904, he undertook of his own motion, and without the knowledge or consent of the president or board of directors of the Mills Company, to assign the said Franklin notes and mortgage to the Trust Company, as he testified, simply to make the showing of assets by the Mills Company, but, as claimed by the Trust Company, to secure the general past indebtedness of the Mills Company to it. The burden of proof being upon the Trust Company to show this transfer and its purpose, the referee holds that it has failed to prove by a preponderance of testimony that the said Godwin undertook to make this assignment of such collateral security. But, if this fact should be found otherwise, the referee finds the further fact that said Godwin had no authority, express or implied, to make the assignment of said notes and mortgage to the Trust Company for this purpose, and that the Mills Company never held him out as possessing such' authority; that he had never before undertaken to make an assignment of its property for the purpose of securing its pre-existing indebtedness, and that he acted in the premises without the knowledge or consent of the president or the board of directors of the company. See Thompson on Corporations, §§ 4697, 4716, 4717, 4722; 2 Cook on Corporations, 717, 719. And, when W. W. Mills, the president of the company, was soon thereafter informed of this transaction by Godwin, he expressed his dissatisfaction therewith. On June 20, 1904, the Mills Company, by its president, W. W. Mills, and its secretary, R. D. Godwin, at the instance of the Trust Company, did make an assignment of said notes and mortgage to the Trust Company as collateral security to the general past indebtedness of the Mills Company to the Trust Company. This was within the four months before the filing of the creditors' petition against the Mills Company, and at a time the company was insolvent, and when the Trust Company knew or had reasonable ground to believe it to be insolvent. The referee holds, under the evidence, that this second assignment was not a ratification of the first invalid and inoperative act of the secretary; but that it was an independent transaction as of the date that it took place. There is another reason why this assignment could not be regarded as a ratification of Godwin's invalid act. It is a general principle of law that there can be

no ratification without a knowledge of the transaction to be ratified. It appears in evidence, and the referee finds, that W. W. Mills had been informed by Godwin that he had not attempted to assign the mortgage for the purpose of securing past indebtedness. Mills, therefore, did not know that there had been any assignment or attempted assignment for this purpose, and therefore, in making the assignment of June 20th, he cannot be supposed to ratify something of which he was ignorant. The referee also holds that,' even had it been a ratification or such invalid or void assignment by the secretary, it does not relate back so as to antedate the four months immediately preceding the filing of the petition. This under the authority of In re Kansas Mfg. Co., Fed. Cas. No. 7,610, 9 N. B. R. 76, and Brandenburg on Bankruptcy, 597, where it is said: "A deed executed without authority by an officer of a corporation more than four months before the bankruptcy, but ratified within that period, must be considered in the light of the situation when ratified." It is clear that the effect of this assignment was to enable the Trust Company to obtain a greater percentage of its debts than the other general creditors of the bankrupt, and that at the time it was made, to wit, June 20, 1904, the Trust Company had reasonable cause to know that the Mills Company was insolvent and bankrupt. The referee further holds, therefore, that the assignment of June 20, 1904, which for the purpose of this inquiry must be regarded as of its date, was made in order to secure a pre-existing indebtedness of the Mills Company to the Trust Company.

The principal question of fact which controls in this matter is whether at that date the Trust Company knew, or had reasonable ground to believe, that the Mills Company was insolvent (there being no doubt that it was then actually insolvent). The testimony upon this question discloses many facts which, considered together, compel the conclusion adverse to the Trust Company.

(1) The evidence is overwhelming that the Mills Company was insolvent as far back as the spring of 1904. W. W. Mills, C. N. Goodno, and R. D. Godwin all so testify; and there is no credible evidence to the contrary. The Trust Company held a large quantity of securities upon the bankrupt's indebtedness to it, which had been furnished by W. W. Mills personally. While these securities assured the payment of the debts for which they were pledged, they did not affect the question of the solvency of the Mills Company; as an application of such securities to the payment of said debt would not extinguish the liability of the Mills Company, but would simply transfer them to the person whose securities had been thus used for its benefit, constituting him, pro tanto, its creditors in the place of the Trust Company.

(2) W. W. Mills, who was always the president of the Mills Company, and who was practically the owner of its stock, had been president of the Trust Company, and one of the directors of the Trust Company from its organization till the 15th day of January, 1904, when he was forced to resign the presidency, but he remained a director of said company until in August, 1904. By means of this dual position he absorbed for the benefit of the Mills Company assets of the Trust Company amounting to over 45 per cent. of its capital stock. Being the principal stockholder of the Trust Company, he virtually controlled its fortunes and management, and so arranged it that the Mills Company was permitted to borrow by discounts and overdrafts over $26,000 while he was the president of both companies. This appears from the schedules in bankruptcy and from the whole testimony, and it does not seem to be disputed by any one.

(3) On January 15, 1904, the said W. W. Mills, still controlling a large proportion of the capital stock of the said trust company, resigned as president, and his brother, John A. Mills, was elected to succeed him. Under the management of the latter officer the Mills Company's indebtedness was increased until it amounted to $46,596.93 as shown by the Trust Company's amended proof of claim. He testified that it amounted to above $60,000 on June 1st.

(4) Many of the notes held by the Trust Company in June, 1904, were debts of long standing, which the Trust Company had been unable after persistent and earnest efforts to collect.

(5) On the 18th day of January, 1904, the Trust Company's board of directors passed a very stringent resolution pointed mainly at W. W. Mills and

his company, which was so offensive to W. W. Mills that he retired from the meeting. This resolution was suggested by the tremendous indebtedness of the company and of W. W. Mills personally, who owed it $60,781.22, as shown by his schedule in bankruptcy, a part of the latter sum upon his indorsement of some of the Mills Company's debts. This condition seriously embarrassed the Trust Company, and justified the resolution.

(6) Soon after the passage of the resolution, W. W. Mills—not the Mills Company—assigned to the Trust Company collaterals which, while they to a certain extent relieved the situation so far as the bank was concerned, did not change the financial condition of the Mills Company.

(7) No other creditors of the Mills Company held any security for his debt, as appears from its schedule in bankruptcy.

(8) The Trust Company was persistent in its demand that the Mills Company should pay an overdraft which on January 1, 1904, amounted to $10,138.88, over 10 per cent. of the capital stock of the Trust Company. On April 6, 1904, it amounted to the sum of $13,623.12, and it was continuous, though reduced from time to time, until August 15, 1904.

(9) It thus appears that nearly one-half of the capital stock of the Trust Company, by the mismanagement of W. W. Mills while president of the Trust Company, and during the incumbency of his brother, his successor in office, had been vested in precarious claims against the Mills Company

(10) The directors of the Trust Company were greatly alarmed about this overdraft and the condition and the amount of other claims against the Mills Company.

(11) The situation was frequently discussed in the meetings of the directors of the Trust Company.

(12) John A. Mills, who was president of the Trust Company when the assignment of the Franklin notes and mortgage were made, and who acted for the bank in said assignment, knew that the Mills Company was insolvent at the time. His direct and positive testimony to this effect given upon a former examination when he was subject to cross-examination by the Trust Company, is not overborne by his subsequent modification, made after an interview with one of the Trust Company's officers and counsel, and with no explanation as to how his memory had been refreshed. He suggested that, when he testified that the Mills Company was insolvent, he meant that it was only embarrassed, although he testified that he knew the difference between "insolvency" and "embarrassment"; that embarrassment as applied to the Mills Company meant that it was involved in difficulties concerning money matters, incumbered with debt, beset with urgent claims and demands; that it could not meet its pecuniary obligations; that, if he had $10,000 worth of property and had a note of $25,000 to pay and did not meet this note when it became due, he would be embarrassed. He further testified that, when he said "if Mills could arrange matters and get time he might pay out," he had reference to his being able to turn what he had into money, and also that he would have to make money to pay out with. In view of this and other testimony of this witness to the same effect, the referee is of the opinion that the credibility and the convincing effect of his first statement were not shaken by his subsequent modification.

(13) On the ——— day of August, 1904, William Hayes, the then cashier of the Trust Company, at the request of John A. Mills, its president, made an examination of the Mills Company, and reported to him that "it was $40,000 to the good." This examination consumed one hour. In it he estimated all the bills appearing on the books at their face value, including $40,000 of old debts contracted while he was with W. W. Mills in the lumber business before the Mills Company was formed, and which W. W. Mills transferred to the Mills Company in part payment of his subscription to stock, and which remained on the books uncollected and uncollectible until he made the examination. He also, as he testified, left out of his calculation $20,000 of indebtedness of the Mills Company of which he then had knowledge. John A. Mills testified that "there was something on his mind that even this report did not relieve; that he had apprehensions that were not relieved by Hayes' report: that he felt that, if he was forced, there might be some trouble, and there was talk about pressing some claims; that if the securities could not

be managed as he thought best, and if he was pushed on anything, he would go into bankruptcy." This was all with reference to the W. W. Mills Company about whose financial condition alone Hayes made his examination and report. Hayes' examination was the only one which the Trust Company made or caused to be made into the affairs of the Mills Company.

(14) The effort of the Trust Company to absorb practically all the available assets of the Mills Company, and W. W. Mills upon its claims against the Mills Company, the solicitude, experienced by the Trust Company in respect to its said claim, is illustrated by the obtaining from W. W Mills on the train by Allen J. Ruffin, Esq., the then president of the Trust Company, of an order to turn over to the Trust Company $20,000 of the securities of the Mills Company, which order was signed by W. W. Mills in consequence of rough talk by said Ruffin, and which order was not thereafter enforced, because it was recognized that a compliance with it would have caused an immediate collapse of the Mills Company. The referee is of the opinion that this incident reflects something upon the relations of the parties and of the estimate of the Trust Company as to the precarious condition of their claims, and of the financial condition of the Mills Company.

(15) Hayes, cashier of the Trust Company, was familiar with the affairs of the Mills Company. He had constant access to its books. He knew as much about its affairs as Godwin and Goodno, the bookkeeper, as testified by him. He knew of its large indebtedness, a great portion of which was to his company. He knew of the incessant demands made upon it for money and securities with which it was unable to comply He knew of the overdraft and of the company's inability to meet it. He knew that W. W. Mills was obliged to come to its relief with nearly the whole of his private fortune. He knew that the Mills Company was insolvent. He had reasonable ground to believe it to be so. And his knowledge is to be imputed to his principal.

(16) The conclusion to which the referee has come as to the knowledge and reasonable grounds to belief of the Mills Company's insolvency is strengthened by the fact that the Trust Company produced none of its officers as witnesses in its behalf. It did examine William Hayes, an ex-officer, but not until after its president had made a trip to Gulfport, Miss., for the sole purpose of having him sign a letter which the president dictated, and which could have no other purpose than that committing Hayes to the facts set forth in that letter, which is in evidence.

It is said in Loveland on Bankruptcy, at page 577: "it is not necessary that the creditor knows or even actually believes that a preference is being given, provided he has reasonable cause to be put upon inquiry as to whether a preference is actually given or not. Constructive notice is sufficient, upon the ground that, when the party is about to perform an act by which he has reason to believe that the rights of a third party may be affected, an inquiry as to the facts is a moral duty and diligence an act of justice. Whatever fairly puts a party upon inquiry is sufficient notice where the means of knowledge are at hand, and if the party under such circumstances omits to inquire, and proceeds to receive the transfer or conveyance, he does so at his peril, as he is chargeable of knowledge and of all the facts, which by a proper inquiry he might have ascertained." In Re Jacobs, 1 Am. Bankr. Rep. 518, 99 Fed. 539, 39 C. C. A. 647, it was held: "A creditor to whom a transfer is made has reasonable cause to believe a preference was intended, if he has knowledge of facts and circumstances which would put a prudent man upon inquiry, and if by such inquiry he could have ascertained the fact that the debtor's financial condition was such that the transfer was preferential in its effect." In Hackney v. Raymond Bros., 10 Am. Bankr. Rep. 214, 68 Neb. 624, 94 N. W. 822, 99 N. W. 675, it was held: "In determining this question it was not necessary to find that the creditor actually knew or believed that the debtor was insolvent. He is chargeable with notice of such facts as a reasonable inquiry, in view of the circumstances with respect to the debtor's condition which were brought home to him, might be fairly expected to disclose." In Des Moines Saving Bank v. Morgan Jewelry Co., 12 Am. Bankr. Rep. 781, 123 Iowa, 432, 99 N. W. 121, it is held: "A reasonable cause to believe that a preference was intended within the meaning of the bankruptcy act involves reasonable cause to believe that insolvency as a matter of fact

exists." The referee is of the opinion that the circumstances surrounding the Mills Company, of which the Trust Company had knowledge, were sufficient to put it upon inquiry. The referee is of the opinion that the perfunctory examination of the W. W. Mills Company was not such an examination into the affairs of this company as the exigencies of the case demanded. The books and records were open to it for inspection. These books showed the assets of the company, which consisted only of bills receivable. The value of the bills receivable might have been ascertained with little trouble. It also showed approximately the indebtedness of the company aided by the knowledge of the Trust Company as to the amount of the indebtedness of the Mills Company to itself. It might with reasonable accuracy have ascertained the total amount of this indebtedness. A proper investigation would have disclosed the fact that its indebtedness exceeded the value of its assets (excluding of course W. W. Mills' personal securities held by the Trust Company), and that the latter amounted to but a small percentage of its indebtedness. A proper inquiry, therefore, would have demonstrated the insolvency of the company. The referee holds that the Trust Company is chargeable with notice of what examination would have shown.

The referee finds, upon a careful review of the whole evidence, that the Trust Company on June 20, 1904, when the Franklin notes and mortgage were for the first time duly pledged as collateral security to the Trust Company, upon antecedent debts, knew, or had reasonable grounds to believe, that the Mills Company was insolvent, and that a preference was thereby intended.

The referee further holds that, where a mortgage or pledge is made to secure an antecedent debt within four months before the filing of a petition in bankruptcy against him, it is not necessary that the creditors should know, or have reasonable ground to believe, that the debtor was then insolvent; a different rule applying to such a case from that which governs when there is an absolute payment of a pre-existing debt. This proposition has been distinctly held by the Circuit Court of Appeals in the Fourth Circuit in the case of Farmers' Bank v. Carr & Co., 11 Am. Bankr. Rep. 733, 127 Fed. 690, 62 C. C. A. 446. The headnote of this case is: "A mortgage made within the four months period, in good faith, to secure a present loan is valid, but cannot be sustained as a security for antecedent debt although the mortgagee believes the mortgagor solvent." The same court in Pollock v. Jones, 10 Am. Bankr. Rep. 616, 124 Fed. 163, 61 C. C. A. 555, affirmed the decision of the district judge. He held the mortgage invalid in a case where a creditor made proof of claim with security in the bankruptcy court, thus submitting himself to its jurisdiction, finding as a fact that the mortgage had been given by Jones to Pollock to secure a pre-existing debt within the four-months period, when Jones was insolvent, and that there was no ground to believe Pollock knew that Jones was insolvent at the time the mortgage was executed. The Circuit Court of Appeals in its opinion, delivered by Judge Simonton, discusses the case of McNair v. McIntyre, 7 Am. Bankr. Rep. 638, 113 Fed. 113, 51 C. C. A. 89: "The facts found in that case were that when the mortgage of Sanderlin, who afterwards became a bankrupt, was executed, it was intended in good faith, neither Sanderlin nor his mortgagee having any knowledge that he was insolvent. Nor is there anything in the record showing that Sanderlin was insolvent." In Farmers' Bank v. Carr, supra, the court said, upon the authority of McNair v. McIntyre: "But the fact that neither the debtor nor the creditor knew or had reason to know that the debtor was in failing circumstances or insolvent must be made to appear clearly and without question." In Re Hill, 15 Am. Bankr. Rep. 499, 140 Fed. 984, it was held: "Where the evidence is clear that the bankrupt in giving a mortgage within the four months period intended thereby to give a preference to the mortgagee, and thus hinder, delay, and defraud creditors, the mortgage is null and void under section 67e." In Re Pease, 12 Am. Bankr. Rep. 66, 129 Fed. 446, it was held: "A chattel mortgage executed by the debtor within the four months period to secure a present loan to be used in part payment of claims of certain of his creditors, of which fact the mortgagee had knowledge or reason to believe it, is an act of bankruptcy under section 3c, subd. 1, and the surety is void under section 67e." Following these controlling decisions, the referee feels obliged to hold that, even if the Trust Company did not know or have reasonable ground to believe the Mills Company to be insolvent, still

the pledge of the Franklin notes and mortgage was invalid; and that, if this were not so, still it was incumbent on the Trust Company "to make it appear clearly and without question" that it did not have this knowledge or these grounds of belief. This the Trust Company has utterly failed to do. The referee directs that the said proof of claim be stricken out and expunged until the said moneys so received as a fraudulent preference by the Trust Company be restored to the trustee, as hereinbefore directed.

The third exception is that there was no consideration for the note of $10,067 given by the Mills Company to the Trust Company on April 11, 1904. The evidence shows that this note was an independent obligation of the Mills Company. It was given at the time of the draft on the Proximity Manufacturing Company for the same amount. This matter will be hereinafter considered. The referee finds that there was no consideration for this note. There was no extension of credit. There was nothing of value upon which the note was based. It was evidently given as a part of the Proximity transaction and as a security for the overdraft, which the testimony shows, and the referee finds, was paid afterwards. The referee is of the opinion that this note no longer constitutes an obligation of the Mills Company, and that it should be stricken from the said proof of claim, and it is so ordered.

The fourth exception is that the Mills Company is not liable on the draft for $10,000 drawn by W. W. Mills on the Cullen Construction Company on June 6, 1904. The referee finds from the evidence that this draft was not drawn or indorsed by the W. W Mills Company, but by William Hayes, cashier of the Carolina Trust Company, upon telegraphic instructions of W. W. Mills to the said Hayes; and that the amount of the draft was placed to the account of the W. W. Mills Company (less the regular bank discount) in the Carolina Trust Company, and that the same was credited in this manner by the Trust Company in reducing the overdraft of this account, and this at the direction of W. W Mills. The draft was drawn on June 4, 1904, and accepted by the Cullen Construction Company on June 6, 1904. The referee finds, therefore, that the final payment of this draft to the Carolina Trust Company within the four months of the filing of the petition of creditors, in bankruptcy, was not a preferential payment to the Carolina Trust Company, as contemplated by the bankruptcy act, as the estate of the W. W. Mills Company had theretofore received the amount of said draft from said Trust Company. This exception is therefore overruled.

The fifth exception is that the Trust Company has no title whatever to the two unsecured notes and two notes and mortgage given by S. H. Kefauver to the W. W. Mills Company; that the said notes and mortgage were never assigned and transferred, and, if they were assigned and transferred, it was without authority, and, if assigned and transferred, they were assigned as collateral security to the overdraft of the W. W. Mills Company upon the Trust Company, which has since been paid in full, so that they are now the property of the bankrupt's estate. The referee finds as facts that the Mills Company was the owner of the two promissory notes for $1,500, each executed by S. H. Kefauver, secured by mortgage on certain personal property; that on or about or in May, 1904, R. D. Godwin, the secretary of the Mills Company, undertook to assign the said notes as collateral security to the overdraft to the Trust Company of the Mills Company; that he had no authority, express or implied, to make this pledge; and that the said overdraft of the Mills Company has since been paid in full. The trustee has collected a portion of said notes. The referee is of the opinion that the trustee has the right to retain the same, and that the Trust Company has no interest in the same. It is so ordered, and the proof of claim will be amended by striking out therefrom the said notes and mortgage as a security

The sixth exception is that the Trust Company has no title to the claim of the W. W. Mills Company against the Proximity Manufacturing Company for $10,068 or any of the sum; that the pretended assignment of said claim by draft on the Proximity Manufacturing Company was without effect, and that it has never been accepted by the Proximity Company; that the said note was assigned, if assigned at all, as collateral security to the overdraft of the W. W Mills Company upon the Carolina Trust Company, which has since been paid in full, so that the claim is now the property of the bankrupt estate, and the said draft and accompanying note for same should be surrendered.

162 F.—4

The Mills Company in its schedule in bankruptcy sets forth a claim against the Proximity Company of Greensboro, N. C., for $20,880.94. On the 1st day of December, 1903, the Mills Company was indebted to the Trust Company in the sum of $3,744.97 by way of overdraft. This overdraft had been of long standing. On the 1st of January, 1904, it amounted to $10,138.84. On the 6th day of April, 1904, it had run up to $13,623.12. The overdraft had given the Trust Company much concern and anxiety. It was apprehending a visit from a state bank examiner, and was very solicitous that the overdraft should be paid or secured. It was very earnest in its efforts to induce the Mills Company to arrange the matter. This company finally, on the 11th day of April, 1904, gave the Trust Company a draft on the Proximity Manufacturing Company, for $10,068.39, being very nearly the exact amount of the overdraft at that time. The draft was never presented, nor was it ever accepted by the Proximity Manufacturing Company, which always denied the supposed claim of the Mills Company. W. W. Mills, who directed the drawing of said draft, testified from personal knowledge that the draft was drawn for the purpose of paying or securing the overdraft, and for no other purpose. Upon direct examination R. D. Godwin stated the same to be the facts in the premises; but, after being interviewed by an officer and attorney of the Trust Company, he changed his testimony, without showing how his memory had been refreshed. More reliance should be placed upon his first statement than on his last. Both John A. Mills and William Hayes testified that the said draft was given as collateral security upon the general indebtedness of the Mills Company to the Trust Company, and not to secure the said overdraft only, but they simply give their understanding in the matter without testifying to what was said at the time the draft was drawn and delivered. They state conclusions rather than facts. They do not speak from personal knowledge. Upon the whole evidence, the referee finds that the draft was given to be applied in liquidation of the overdraft. But this draft was not to be paid, as was distinctly understood at the time in a written notice from the Mills Company to the Trust Company, until July 11, 1904, and that it was to be held under a condition of further instructions from the Mills Company. July 11, 1904, was within the four months of the filing of the petition in bankruptcy. The referee further finds from the testimony that the overdraft was afterwards paid by the proceeds of the discount of a draft on the Cullen Construction Company is entitled to the return and cancellation of the Proximity draft. It appeared that the Mills Company had not demanded the return of the overdraft or its cancellation, but the referee is of the opinion, and so holds, that this did not authorize the Trust Company to retain the draft or to apply its proceeds upon the general indebtedness of the Trust Company. There is no evidence that the Trust Company ever attempted to collect this draft or to collect any part of the claim of the Mills Company against the Proximity Manufacturing Company, which claim the latter company had always denied. There is no evidence that the said draft had even been presented to the Proximity Manufacturing Company, and it appeared that the draft had never been accepted by the latter company. The referee's conclusion is that there was no equitable assignment of any part of the claims of the Mills Company against the Proximity Manufacturing Company by the drawing of the said draft, and that the said claim belongs to the trustee in bankruptcy. It is therefore ordered that the proof of claim be amended accordingly.

The seventh exception is as follows: "That the note and mortgage made on the 10th day of February, 1904, by the Montgomery Railway Company to W. W. Mills, and indorsed by him to the Carolina Trust Company, were made without authority and are of no effect. That the said W. W. Mills was insolvent when he undertook, without consideration, to indorse this note to the Carolina Trust Company. That said indorsement was void as to his creditors, for that, being insolvent, he did not retain property amply sufficient and available to pay his creditors. Furthermore, the said Montgomery Railway Company was not indebted to said W. W. Mills in any amount when the said note and mortgage were executed, as the said Carolina Trust Company well knew."

The evidence of W. W. Mills in regard to the Montgomery Railway note and mortgage, under the direct examination of counsel for the trustee, was as follows:

"Q. Please state the facts about the note of the Montgomery Railway Company, made payable to you on the 15th day of February, 1904, and indorsed by you to the Carolina Trust Company, which note was secured by deed of trust of same date as note of the railroad.

"A. The note was made to me for the purpose of securing any account that the Mills Company had, and I acted more as trustee in the matter than anything else.

"Q. Had you given to the Montgomery Railroad Company anything of value as money, or other thing as consideration of that note as executed by you? (Objection. Objection overruled. Exception.)

"A. No, sir.

"Q. Will you state the facts and circumstances that occasioned the making of this note to you and all about it? (Objection. Objection overruled. Exception.)

"A. The Carolina Trust Company asked the Mills Company to put up collateral for their loans, and the Mills Company owned most of the stock of the railroad company, and this was a part of their assets for which they could give collateral. They owned all of the stock except a share or two.

"Q. At whose suggestion did you make the note?

"A. It was made at the suggestion of the directors of the bank.

"Q. Besides the Mills Company, who owned stock in the Montgomery Railroad Company?

"A. I owned a share, Mr. Hayes a share, and Godwin a share.

"Q. Who were the board of directors?

"A. Hayes, Godwin, and myself.

"Q. Who prepared the note and mortgage that was executed?

"A. Mr. Strong.

"Q. Was he attorney for the Montgomery Railroad Company?

"A. No, sir; he acted for the Montgomery Railroad Company. He did it more as accommodation than anything else, as I understood it.

"Q. Was he acting for the Carolina Trust Company as their attorney?

"A. Yes; he was their attorney at the time.

"Q. In drawing that paper was he acting as attorney for the Carolina Trust Company or attorney for the Montgomery Railroad Company?

"A. I could not answer that question because the paper was submitted to the directors after it was drawn. He did not pass on that paper.

"Q. To any transactions of getting this security for the Trust Company and in preparing the paper, can you state whether or not he was acting for the Trust Company? (Objected to because the question has already been asked and answered. Objection sustained. Exception.)

"A. I can't say of my own knowledge that Mr. Strong was instructed by the Carolina Trust Company.

"Q. Perhaps I may be able to refresh your recollection Don't you remember on some former examination of the Mills case you stated you thought he represented the Trust Company in that transaction? What do you think about it now?

"A. I think that now.

"Q. Is that your impression now?

"A. Well, what I think, of course, would be my impression. (Objection by counsel for the Carolina Trust Company to the preceding question and answer. Objection overruled. Exception.)

"Q. To what directors was the paper submitted?

"A. To the board of directors of the Carolina Trust Company.

"Q. They were executed in the form in which they were drawn by Mr. Strong?

"A. They were executed like they were drawn, not like they were originally drawn. I think they were originally drawn as personal property. They were first drawn for Mrs. Mills and myself to sign. Then I told Mr. Strong it was a corporation, that we had to have a corporation in order to haul the freight out, and it was organized and made a corporation on that account. Then he drew up the next papers.

"Q. Did you originate the plan under which this note was to be drawn or executed by the Montgomery Railroad Company to you and you indorse it to the Trust Company?

"A. I can't say that I did. Mr. Strong and I together talked the matter over as to how it was to be made to convey it as a collateral.

"Q. State the circumstances and facts about it.

"A. He said that the Montgomery Railroad Company could not make a mortgage to secure a debt of the Mills Company in any other way, as he saw it. That is my recollection. They were to make me a note, and I was to take their note and indorse it, and deposit it with the Trust Company as collateral.

"Q. So that the Trust Company never gave any consideration to the Montgomery Railroad Company for their note of mortgage? (Objection. Objection overruled. Exception.)

"A. No, sir.

"Q. To what debt was the Montgomery Railroad's note and mortgage transferred as security? (Objection. Objection overruled. Exception.)

"A. Any and all debts of the Mills Company."

John W. Hinsdale, Esq., attorney for the trustee makes the following statement: "The trustee admits that Mr. Strong did not know at the time that he drew the mortgage, or at the time the papers were received as collateral, whether or not the Montgomery Railroad Company owed Mr. Mills." The respondents objected in apt time to the admission of any of the testimony in reference to the Montgomery mortgage as irrelevant to this proceeding and moves to strike out all of the testimony. Motion denied. Exception.

The referee finds the following facts: On the 15th day of February, 1904, the Montgomery Railroad Company, a North Carolina corporation, which was owned entirely by the W W Mills Company, with the exception of three shares of its capital stock, undertook upon the suggestion of the directors of the Carolina Trust Company, to execute a note for $10,000, secured by a mortgage on all of its property, to W. W. Mills, and it was with the understanding with Mills, which was immediately carried out, that the said note should be indorsed by him to the Carolina Trust Company as collateral security upon the pre-existing indebtedness of the said Mills Company to the Trust Company. The papers were drawn by the attorney and director of the Trust Company, who suggested the legal form of the papers which were drawn. It is a fact which appears in evidence that the note and mortgage was called for by the directors of the Carolina Trust Company, and was finally passed upon and accepted by them. It appears as a fact in evidence that on the day the note and mortgage were executed by the Montgomery Railway Company that William Hayes, cashier of the Trust Company, who was a stockholder and director of the said Montgomery Railroad Company and its secretary, resigned as such secretary, and did not participate in the meeting. A new secretary acted at the meeting when the note and mortgage was executed. The note and mortgage was afterwards indorsed by Mills to the Trust Company as collateral security upon the Mills Company's pre-existing indebtedness, as stated above. There were only three stockholders of the Montgomery Railroad Company—W. W. Mills, R. D. Godwin, and William Hayes, the last two owning but one share each. Mills swears, as appears in the evidence, that in taking the note and mortgage in his name, and indorsing it over, that he acted more as trustee in the matter for the Trust Company than anything else. And it appears in the evidence, quoted in this finding of facts for clearness, that he was advised that the Montgomery Railroad Company could not make a mortgage to secure a debt of the Mills Company in any other way. There was no meeting of the stockholders of the Montgomery Railway Company, but there was a special meeting of the directors for the purpose of authorizing the execution of the note and mortgage. No notice of this meeting was given to William Hayes, one of the directors, and he did not attend said meeting. The property of the Montgomery Railway Company was afterwards, on or about the 14th day of December, 1904, sold by the Carolina Trust Company for $939.45 over and above a prior mortgage upon the same for $3,927.50 and costs, in favor of one H. A. Page. Upon the foregoing facts, the referee holds that the note of the Montgomery Railway Company to W. W. Mills, being without consideration, was unenforceable in his hands, and that the Trust

Company took the note with knowledge of its want of consideration; that it was not a purchaser for value without notice, as it is attached with knowledge of the facts, and it paid no present consideration to either W. W. Mills or the Railway Company for his indorsement; that, therefore, the note and mortgage were unenforceable in the hands of the Trust Company. The referee also holds that the said note and mortgage were invalid, for the reason that they were executed without authority; because the special meeting of the directors for the purpose of authorizing the execution of the note and mortgage was held without any notice being given to William Hayes, one of the three directors, and he was not present at the meeting; and, further, because there was no meeting of the stockholders to authorize a mortgage upon the Montgomery Railway Company's entire property. It is ordered that the proof of claims be amended by striking out the note and mortgage of the Montgomery Railway Company as a security therein.

The eighth exception is as follows: "That the assignment of $80,000 of stock owned by W. W. Mills in the Raleigh & Cape Fear Railway Company, on the 15th day of February, 1904, for the purpose of securing the indebtedness of W. W. Mills Company to the Carolina Trust Company is invalid and of no effect, for that the said W. W. Mills was insolvent at the time, and did not retain property amply sufficient and available to pay his creditors." The referee finds the following facts: W. W. Mills on February 18, 1904, was the owner of $80,000 of the capital stock of the Raleigh & Cape Fear Railway Company. On that day he executed to the Trust Company the following instrument: "North Carolina, Wake County. I hereby pledge, assign and convey to the Carolina Trust Co., for the purpose of securing any and all notes, discounts, demands and obligations of the W. W. Mills Co., a corporation, and the Biscoe Lumber Co., a corporation, which said Trust Company may now hold or hereafter hold or acquire in $80,000, face value of my stock in the R. & C. Ry. Co., certificate numbers being as follows: 91, 88, 89, 90, 92, and 93, and I hereby authorize and empower said Trust Co., to apply the stock hereby hypothecated to the notes, discounts, demands or obligations herein mentioned, or to any or all of them from time to time, to such proposition, lots or parcels as the said Trust Company may see fit. The said stock to be held or realized upon by said Trust Co., by the terms of notes, discounts, demands or obligations now existing, or which may hereafter exist, and held by said Trust Co., or the said Biscoe and Mills Cos., or mine. [Signed] W. W. Mills. [Seal.] Stock indorsed and attached this Feb. 15th, 1904. [Signed] H. F. Smith. Witness." This paper had never been registered. The certificate of stock for $80,000 was indorsed by W. W. Mills to the Carolina Trust Company. When this paper was executed, the said W. W. Mills was heavily in debt, and he did not then retain property amply sufficient and available to pay his creditors. The referee finds as a conclusion of law that the said instrument was a pledge of the said stock, and not a mortgage, and that it did not require registration; that the said instrument is valid against the creditors of W. W. Mills in so far as it attempted to pledge the said stock as collateral security to the debts of the Mills Company and the Biscoe Lumber Company, upon which he was bound. It is accordingly ordered that the said proof of secured claim be amended by striking out this stock as a collateral security on the indebtedness of the W. W. Mills Co. and the Biscoe Lumber Company, other than that upon which W. W. Mills was bound.

The ninth exception is as follows: "That the Carolina Trust Company has no lien, under chapter 275, p. 469, Pub. Laws N. C. 1903, upon the stock of W. W. Mills in the Carolina Trust Company, being described in the said proof of claim as 'about 140 shares of stock of the said Carolina Trust Company' in the name of W. W. Mills or upon any other stock of said company by him, and that the same was the individual property of said W. W. Mills and belonged to his estate for the benefit of his general creditors." The referee finds the following facts: W. W. Mills was the owner of 145 shares of the capital stock of the Trust Company of the par value of $100 each. In addition to these shares, the said W. W. Mills was the owner of 40 shares of said stock, which was pledged to the National Bank of Raleigh, N. C., 50 shares of said stock which was pledged to the Raleigh Savings Bank of Raleigh, N. C., 50 shares of said capital stock which was pledged to W. C.

Douglas, 200 shares to the Chatham Savings Bank, to secure a note for $6,000. The said Trust Company purchased said note, and thus subrogated to the lien on said stock which was held by said Chatham Savings Bank as security upon the said note. On the 26th day of July, 1904, W. W. Mills agreed with the Trust Company to sell his stock to said company at a price to be fixed by arbitrators and on the 9th day of August, 1904, the arbitrators made an award appraising the stock at $75 a share. Accordingly the Trust Company on the 9th day of August, 1904, purchased from the said Mills 200 shares of stock at the aggregate price of $15,000, which it now holds to be applied under the direction of this court. Copies of the submission and award are set forth in the Trust Company's amended proof of secured claim filed herein. The Trust Company claims a right to apply the proceeds of this stock and of the other stock held by Mills in the Trust Company, under the supposed statutory lien to the indebtedness set forth in its proof of claim herein, upon which W. W. Mills is liable. This claim is made under chapter 275, p. 469, Pub. Laws N. C. 1903. The referee holds that the contract of said bills of sale of his stock to the Trust Company, the submission to arbitration, and the award of the arbitrators fixing the price at which said stock should be sold are valid and binding upon all the parties; that the price of the said stock must be paid in cash. The Trust Company was chartered by a private act of the General Assembly of North Carolina (chapter 65, p. 80, Priv. Laws 1895). Under this act its stockholders had the untrammeled right to dispose of their stock without let or hindrance. The Legislature of 1903 enacted chapter 275, p. 469, Pub. Laws 1903, for the regulation of certain corporations formed thereunder. The referee is of the opinion that this statute does not apply to the Trust Company, and, if it does, it is invalid as interfering with the right of disposition which is inherent in the right of ownership, and which is secured to every stockholder by his contract of subscription with the company. Such a law would impair the obligation of the contract, and as such is inhibited by the Constitution of the United States. The referee therefore holds that the Trust Company had no statutory lien under the said act of the General Assembly of North Carolina. But it does have a lien to the amount of its debt and interest on such portion of said stock as it received from the Chatham Savings Bank to secure the note to the said Chatham Savings Bank, upon which it is pledged as collateral. It is therefore ordered that the said proof of claim of the Carolina Trust Company be amended by striking therefrom the said stock as collateral security upon all claims, except the note which the Trust Company purchased from the Chatham Savings Bank.

The ninth exception. This exception embraces a great many items, the large majority of which relate to a series of discounts and corresponding payments made by and to the Trust Company in respect to sight drafts drawn by the Mills Company on third persons, the proceeds of which went to the credit of the Mills Company in its account with the Trust Company, with the understanding that, if the said drafts should not be paid, they should at once be taken up by drawer as cash items. The result of this series of transactions to the extent of $286.50 overdraft of the Mills Company on 11th day of August, 1904, which was paid on or before the 19th day of August, 1904, as appears from the statement of the account furnished by the Trust Company. The referee has already found that at that time the Mills Company was insolvent and the Trust Company knew or had reasonable ground to believe it to be so. Nevertheless, the referee holds that the payment of this overdraft in this manner did not constitute a fraudulent preference, because the overdraft should be treated as a cash item; it having been agreed between the parties that these honored sight drafts should be paid immediately upon their return. The referee concludes that the payment of drafts as appears by the testimony does not constitute a fraudulent preference under Bankr. Act July 1, 1898, c. 541, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3418).

There are, however, a number of items in said exception which stand upon different footing from the payment of the discount sight drafts which were returned dishonored. The following are the items referred to:

(1) The assignment by the Mills Company of the Franklin notes and mortgage. This has been heretofore considered and held to have constituted a fraudulent preference.

(2) The receipt and appropriation on September 22, 1904, of $3,000, the proceeds of Franklin mortgage and notes to the payment of certain overdrafts and other antecedent indebtedness.

(3) The receipt on December 3, 1904, of 140 of W. W. Mills shares of stock in the Trust Company. It has not been applied to any indebtedness. There has been no agreement or consent of the said Mills that it should be so applied.

But, if it should be found otherwise, the transaction comes within the ban of the bankruptcy law as being a fraudulent preference. At the time of the transaction the said W. W. Mills was hopelessly insolvent, as was known to the Trust Company, or as it had good reason to so believe; the effect of the preference being to enable the Trust Company to receive a larger percentage of its claim than other creditors of the same class. The proceeds of its sale are now held by the Trust Company, claiming the right to apply them in any of the Mills Company's liabilities upon which W. W. Mills is indorser. The referee concludes that said bank stocks should be stricken from the proof of claim as a security for any debt mentioned therein, and it is so ordered.

(9) The payment on June 20, 1904, of the note of the Mills Company for $400 which had been previously discounted by the Trust Company, stands upon a different footing from the series of transactions connected with the dishonored sight drafts above referred to. This was a fraudulent preference, because it was the payment of an antecedent debt by an insolvent person, the creditor. The Trust Company knowing or having reasonable ground to believe it to be such, and the purpose and effect of the transaction being to enable the Trust Company to receive a larger percentage of its debt of $400 than other creditors of the bankrupt of the same class, it is ordered that the Trust Company shall pay to the trustee the sum of $400, with interest, and that, unless this be done, the Trust Company's proof of secured claims be stricken out and expunged.

(13) The payment on July 1, 1904, by the Mills Company of the note of W. W. Mills for $425 in favor of the Mills Company and indorsed by said company and discounted on April 13, 1904, by Trust Company. This note constituted an ordinary pre-existing indebtedness of the Mills Company to the Trust Company, which could not be paid by the former company except in violation of the provisions of the bankruptcy act.

The referee finds that the Mills Company was insolvent on July 1, 1904, and that the Trust Company knew, or had reasonable ground to believe, it to be insolvent at that time, and that the effect of the payment was to enable the Trust Company to receive a larger percentage of its debts than other creditors of the Mills Company of the same class. The referee therefore holds that this payment was a fraudulent preference. It is therefore ordered that the Trust Company pay to the trustee of the Mills Company the sum of $425, with interest from April 13, 1904, and, that unless this be done, proof of preferred claim be stricken out and expunged.

(15) The payment on July 7, 1904, by the Mills Company to the Trust Company of the following notes which had been discounted by the Trust Company at the dates of the respective notes: Note of Mills Company to Z. P. Wright for $126.72; note of Mills Company to J. R. Franklin for $323; note of Mills Company to American Planing Mills for $108.21. Each of these notes constituted a pre-existing indebtedness of the Mills Company to the Trust Company. The referee makes the same finding of fact in respect to each of these notes as is made in reference to the note described in 13 above. He therefore concludes that the payment of these notes constituted a fraudulent preference. It is therefore ordered that the Trust Company pay the trustee the several sums of $126.72, $323.00, and $108.21, and interest on same from the 7th day of July, 1904, and that, unless this be done, the said company's proof of preferred claim be expunged.

(17) The payment on July 11, 1904, by the Mills Company to the Trust Company of the note of the Mills Company to K. B. Johnson for $230, dated May 7, 1904, and discounted on that day by the Trust Company. This and its indorsement by the Mills Company constituted a pre-existing indebtedness of that company to the Trust Company. That the referee makes the same findings of facts in respect to this note as he made in reference to the note in

13 above. The referee holds that the payment of this note constituted a fraudulent preference. It is ordered that the Trust Company pay to the trustee $230, with interest from June 11, 1904, and that, unless the same be done, the said proof of preferred claim be stricken out and expunged.

The foregoing report, together with the voluminous testimony filed therewith, have been carefully examined, and it is evident the findings of fact are supported by ample proof, competent testimony. Hence the findings of fact are in all respects confirmed. The conclusions of law are upon authority and are hereby confirmed, as are the orders contained in the report in all respects. The whole report evidences a patient hearing on the part of the referee and a proper solution of the difficult questions involved, as it does a faithful, painstaking, energetic discharge of duty by the trustee. Both officers are entitled to the highest commendation.

The report is adopted and confirmed.